**David OJEDA–SANCHEZ, et al.,
and all others similarly
situated, Plaintiffs,**

v.

**BLAND FARMS, et al., Defendants.**

No. 608CV096.

United States District Court,
S.D. Georgia,
Statesboro Division.

March 4, 2009.

Charlotte S. Alexander, Dawson Morton, Lisa J. Krisher, Georgia Legal Services, Atlanta, GA, John P. Batson, Attorney at Law, Augusta, GA, for Plaintiffs.

William E. Dillard, III, J. Curt Thomas, Brennan & Wasden, LLP, Savannah, GA, Timothy Harden, III, Smith, Hawkins, Hollingsworth & Reeves, LLP, Warner Robins, GA, for Defendants.

## *ORDER*

B. AVANT EDENFIELD, District Judge.

### I. *INTRODUCTION*

Plaintiffs David Ojeda–Sanchez, Florencio Cortes–Gonzalez, Alfonso Guerrero–Hernandez, Arturo Morales–Morales, Raul Morales–Morales, Oscar Antonio Morales–Ramirez, and Juan Pablo Ortiz–Rocha worked on defendants' farm as H–2A guestworkers during various seasons between 2004 and 2007 planting and harvesting onions. Doc. # 1 at ¶ 1. They assert

several claims against defendants Bland Farms, LLC, Delbert Bland, and Michael Hively (collectively "Bland").

Count I of the Complaint alleges that defendants violated the Fair Labor Standards Act (FLSA) by "failing to pay each worker at least an average of the applicable minimum wage for every compensable hour of work performed in the workweek, in violation of 29 U.S.C. § 206(a)." Doc. # 1 at 1106. Plaintiffs have filed a motion to conditionally certify that claim as a collective action under 29 U.S.C. § 216(b). Doc. # 5-2. The Court has yet to rule on that motion, and will do so in a separate order.

In the meantime, plaintiffs seek a protective order to bar defendants and their employees and agents from further communications with plaintiffs, potential opt-in plaintiffs, and their family members. Doc. # 6. They allege that a protective order is necessary because of defendants' efforts to intimidate plaintiffs to discourage them from participating in this lawsuit.

## II. *BACKGROUND*

Plaintiffs claim that a protective order is necessary in this action based on communications that defendants' agents had with certain plaintiffs in 2008. These communications were in the form of telephone calls and in-person visits to two of the plaintiffs' homes in Mexico.

The communications followed a request by plaintiffs' counsel, Georgia Legal Services (GLS), for employment records from Bland. The Federal Regulations governing the H-2A program require employers to make employment records available "for inspection and copying by the Secretary of Labor, and by the worker and representatives designated by the worker." 20

C.F.R. § 655.102(b)(7)(iii) (2008). The record reflects a dispute between GLS and Bland as to whether defendants were required to release the employment records of the named plaintiffs. Doc. # 30 at 7. Bland took the position that GLS must submit some evidence that it had been designated as the plaintiffs' representative before it would release the records. GLS disputed this interpretation of the regulation and refused to provide such documentation.

Due to this dispute, Bland argues that it was necessary for them to contact plaintiffs to determine if they had in fact designated GLS as their representative before Bland could release their employment records. Sharon Spell, Bland's Finance and Accounting Manager, has filed an affidavit in which she states that she directed Omar Cruz, another employee of Bland Farms, to go to Mexico to verify whether the plaintiffs were represented by GLS. Doc. # 28-2, exh. D. An affidavit filed by Cruz confirms that this was the reason for his trip to Mexico. Doc. # 28-2, exh. A at ¶ 2 (stating that "the sole purpose of [his trip to Mexico] was to ensure that [plaintiffs] were aware of [this litigation] and to obtain their consent to release [the documents requested by GLS] in the event that [plaintiffs] had contracted for the services of the lawyer.")

On 9/30/08 Cruz traveled to Guadalajara, Mexico to track down several of the plaintiffs. Both parties have submitted affidavits describing the events that took place there, and each side has painted a very different picture of the encounters.

Cruz describes his version of the events in his affidavit. Upon arrival in Mexico, Cruz met with Jose Lopez, Bland Farms' foreman who was in charge of the H-2A workers. Doc. # 28-2, exh. A at ¶ 3. They

tracked down a former Bland Farms worker named Fausto Zabala and solicited his help. Cruz, Lopez, and Zabala then drove about an hour to a small community where they met Oscar Morales–Ramirez (Oscar) at his home. *Id.* at ¶ 6. Cruz characterized the encounter as a friendly conversation accompanied by drinks around Oscar's dining table. *Id.* at ¶ 8. Once he breached the subject of the law suit, Cruz says that Oscar expressed surprise and told Cruz that he had never signed onto any lawsuit or hired GLS. *Id.* at ¶ 11. Cruz showed Oscar a document stating that Oscar was not involved in the lawsuit and Oscar willingly signed it. *Id.* at 12.

Next, Cruz asked Oscar to accompany them to the house of Raúl Morales–Morales (Raúl)—Oscar's cousin. There, they found Raúl with his wife and children on top of a hill near Raúl's house. Cruz again notes the hospitality he was shown when Raúl offered him some corn that Raúl and his family were cooking. *Id.* at ¶ 14. Cruz brought up the law suit and Raúl told him that he had told GLS to stop calling him because he was not interested in participating in the suit. *Id.* at ¶ 15. Cruz says he told Raúl that he was welcome to come back to work at Bland Farms regardless of whether he had hired GLS. *Id.* at ¶ 16. Cruz then gave him a copy of the document disavowing his participation in the law suit, and Raúl signed it. *Id.* Before leaving, Cruz says that he was inspired by the beautiful view, so he took some pictures of Raúl, and Raúl's wife and children, and another picture with all his workers as a remembrance of his trip. *Id.* at ¶ 17. Cruz attested that

> I did not at any time harass, intimidate, coerce, pressure or threaten any worker, or any member of their family, with bodily harm or any negative conse-

quences whatsoever, if they participated in a lawsuit against Bland Farms of if they would not sign a paper saying that they were not participating in a lawsuit against Bland Farms. No one at Bland Farms asked me to do so. I did not ask anyone else to do so and I have no knowledge of anyone having done so.

*Id.* at ¶ 17.

Defendants also have submitted the affidavits of Jose Lopez and Fausto Zabala which largely confirm Cruz's account. Lopez attests that he did not see Cruz or anyone else attempt to coerce or intimidate Raúl or Oscar and that neither of them appeared frightened. Doc. # 28–2, exh. B at ¶ 4. Lopez, however, was not personally involved in some of the conversations. *Id.* at ¶ 6. Zabala says that he saw no evidence of any attempt to intimidate Oscar or Raúl and says that Raul did not look frightened or worried. Doc. # 28–2, exh. C at ¶¶ 7, 11. He says the photograph was taken as a "friendly gesture." *Id.* at ¶ 13.

Plaintiffs have submitted their own affidavits which paint the encounter with Cruz in quite a different light. Oscar attests that Cruz told him that he "should not talk to the people that visit the workers there at Bland's farm because after giving them personal information, these people could steal one's identity and never return to help you." Doc. # 6–8 at ¶ 6. He claims that he signed the paper denying association with GLS because "[he] understood that this was the response that [Cruz] and [Lopez] demanded." Doc. # 6–8 ¶ 7. He continues,

> [T]he truth is that I want the Legal Services attorneys to represent me in my claims related to my problems with pay at Bland Farms. I signed the pa-

pers because I felt pressure. I am scared of [Lopez] and [Cruz] and the others from the company, due to their power. I have this fear because if they are able to arrive at my house so far from Georgia, they and the company and the owners that manage them are able to send other people to visit me, maybe people that could do harm to my family.

Doc. # 6–8 at ¶ 8.

Oscar also attests that the visit "causes me many doubts about whether I should sue. I do not want to withdraw myself from representation, but I also do not want [Lopez and Cruz] to continue calling and visiting me and my family." Doc. # 6–8 at ¶ 12. He believes he is being pressured to withdraw from representation in this lawsuit. Doc. # 6–8 at ¶ 12. His affidavit additionally claims that Lopez had called him by telephone in 10/07 and suggested that Bland Farms would not be able to hire him if he continued with the lawsuit. Doc. # 6–8 at ¶ 11. Oscar denied his participation in the lawsuit. *Id.*

Raúl's affidavit describes the arrival of Cruz and Lopez as "very abnormal and [he] did not trust their motives when [he] saw them getting out of their automobile." Doc. # 6–4 at ¶ 6. When Cruz gave Raúl the papers to sign, Raúl says that "[i]t was obvious what they wanted me to do[.] I answered the questions and signed the paper out of fear that it would cause me more problems if I did not sign." *Id.* at ¶ 9. He says,

> [I]t could be that the paper said that I was signing voluntarily—but this was not the truth. The truth is that I was frightened by [Cruz] and [Lopez]'s visit. It is clear that they and the company have a lot of power. The company sends them to our remote homes only

because they did not want us to protest about our pay.

*Id.* at ¶ 9. Raúl also claims that Cruz told him he "could not win a lawsuit because ... [out] of the three hundred workers that go to work for Bland, [he] was the only one complaining that the pay was not correct," *id.* at ¶ 12, and that if he did not sign the paper, he would not be able to return to work with Bland, *id.* at ¶ 13. He did not want pictures taken of his family but was told that they would serve as "testimony that [Raúl and Oscar] had signed." *Id.* at ¶ 14. As a result of the visit he was afraid for himself and his family, and his wife was also "very frightened." *Id.* at ¶ 15. He also wants to continue to receive representation from GLS. *Id.* at ¶ 16.

Finally, Arturo Morales–Morales (Arturo) has filed an affidavit. Cruz and Lopez tried to speak with him while they were in Mexico, but Arturo was working in the Dominican Republic at the time. Doc. # 6–7 ¶ 8; doc. # 28–2, exh. A at ¶ 13. However, Arturo attests that Lopez had previously called him by telephone and told him that "those who had a lawsuit were not going to return to work with the farm." Doc. # 6–7 at ¶ 5. During that call, Arturo says that he denied that he was participating in a lawsuit because he was afraid that he would not be rehired. *Id.* at ¶ 7.

Plaintiffs also allege that Cruz intended to obtain the signatures of other workers in Mexico during his trip. Doc. # 6–8 at ¶ 10. There is no evidence that any other seasonal workers were contacted, and defendants have denied doing so. Doc. # 28–2, exh. B at ¶ 8. Of the seven named plaintiffs, there is only evidence that defendants contacted three of them.

Plaintiffs contend that defendants' communications were abusive and coercive and

threatening to this litigation. Thus, they seek a protective order to prevent future communications regarding this litigation between defendants and plaintiffs and potential opt-in plaintiffs. Defendants deny that any communications they had with plaintiffs were abusive or coercive. Further, they argue that a protective order is not only unnecessary, but it is not supported by law and is an infringement on their constitutionally protected free-speech rights and their right to adequately defend themselves in this lawsuit. Additionally, they claim that a protective order should not restrict communications with parties who have yet to opt-in to this suit and that a protective order is not appropriate prior to certification of a class.

### III. ANALYSIS

■ The Court has broad authority to oversee the management of collective litigation. "Class actions serve an important function in our system of civil justice. They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99–100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Thus, the Court "has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties." *Id.* at 100, 101 S.Ct. 2193. While this litigation involves a collective action under the FLSA rather than a Rule 23 class action, the same concerns and justifications for judicial oversight apply in both cases. *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

■ An order limiting contacts is justified upon a finding of "a likelihood of serious abuses." *Hampton Hardware,*

*Inc. v. Cotter & Co., Inc.,* 156 F.R.D. 630, 633 (N.D.Tex.1994). Actual harm need not be proven. *Id.; see also Kleiner v. First Nat'l Bank,* 751 F.2d 1193, 1206 (11th Cir. 1985). However, any protective order "limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation...." *Gulf Oil,* 452 U.S. at 101, 101 S.Ct. 2193. It should be "carefully drawn" and should limit speech "as little as possible." *Id.* at 102, 101 S.Ct. 2193.

■ As the requested protective order will limit defendants' speech, the Court must take into account First Amendment considerations. However, the speech at issue—communications regarding pending litigation—is of a commercial nature designed to protect the defendants' business interests at risk in this litigation. *Kleiner,* 751 F.2d at 1204 n. 22 (defendants' communications with potential class members regarding litigation was commercial speech); *Hampton Hardware,* 156 F.R.D. at 633 (same). Commercial speech is subject to more limited constitutional protection. *Kleiner,* 751 F.2d at 1205. "In general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy First Amendment concerns if it is grounded in good cause and issued with a 'heightened sensitivity' for First Amendment concerns." *Id.* (citation omitted).

■ The party moving for a protective order must make two showings: (1) that a particular form of communication has occurred or is threatened to occur, and (2) that the particular form of communication at issue is abusive and threatens the proper functioning of the litigation. *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.,* 214 F.R.D. 696, 697–98 (S.D.Ala.2003).

As it is undisputed that communication between defendants and plaintiffs has occurred, the Court's analysis turns on whether the record reflects clear and specific evidence that the type of communications engaged in by the defendants has been abusive and threatens this litigation.

First, the Court notes that defendants have offered a plausible legitimate reason for their communications with plaintiffs. The law requires H–2A employers to provide employee records to "designated parties," but GLS did not produce any documentation that plaintiffs had designated them as their representatives. *See* 20 C.F.R. § 655.102(b)(7)(iii) (2008). Defendants had called at least one of the plaintiffs (Arturo), who denied participating in the lawsuit. Nonetheless, GLS continued to insist that he was a participant. Thus, travelling to Mexico to obtain a written statement may have been the only way to resolve this dispute.[1]

Furthermore, defendants have submitted sworn affidavits to the effect that no retaliatory threats or coercive tactics were used. They also note that only three of the seven named plaintiffs were contacted and that there is no evidence that Bland has discussed this litigation with any putative class members.

■ On the other hand, plaintiffs have alleged statements by defendants that, if true, would meet the threshold of abusive and coercive communications. "Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Cox Nuclear Med.*, 214 F.R.D. at 698. Here, the statements to Oscar and Arturo that they would not be rehired if they participated in litigation, the statement to Raúl that proceeding with the lawsuit would be futile because he was the only one complaining, and the statement to Oscar that he should not speak with GLS because they "could steal one's identity and never return to help you" could all be characterized as abusive and threatening to the litigation.

Of course, whether these particular types of statements were actually made during those conversations is disputed. Therefore, the Court examines the context in which the communications were made and the effect of the communications to help guide its determination.

■ The defendants have engaged in unilateral and unsolicited communications with class members. The Eleventh Circuit has noted the potentially undesirable effects of unilateral communication with potential class members. "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Kleiner*, 751 F.2d at 1201.

Also, there is a past as well as a potential future employment relationship be-

---

1. The Court takes no position on whether GLS was required to provide proof of the workers' consent to representation in order to obtain employment records from Bland Farms. That issue is not before the Court. The Court merely concludes that Bland's explanation seems reasonable and supports their position that the communications were not made in bad faith.

tween the parties which increases the risk that communications between them will have a coercive effect. *Belt v. Emcare, Inc.,* 299 F.Supp.2d 664, 668 (E.D.Tex. 2003) ("[W]here the absent class member and the defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive"); *Kleiner,* 751 F.2d at 1202 ("If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.") (quotes, cite, and alterations omitted).

Defendants attempt to minimize the effect of any employment relationship by pointing out that Bland Farms hires workers on an "as needed basis" and there is no guarantee of future employment to any particular Plaintiff or potential worker for any season. . . ." Doc. # 15–4 at 11. Additionally, they note that one of the plaintiffs had voluntarily found seasonal employment elsewhere and that others were not sure whether they wanted to return to work at Bland. Thus, they essentially argue that they could not threaten workers with the loss of speculative employment for which they had no need or desire. While such circumstances might mitigate some coercive influence that defendants had on plaintiffs, the Court is not convinced that it eliminates it.

Finally, the communications were in-person and required the plaintiffs to make a decision under the pressure of the moment. As the Supreme Court has acknowledged:

[I]n-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision[-]making; there is no opportunity for intervention or counter-education. . . .

*Kleiner,* 751 F.2d at 1206 (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 457, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)).

To be clear, communications are not *per se* coercive when these factors are present. For example, the Court can certainly envision situations in which an employer's contact with employees who are putative class members would not be coercive. *See e.g., Basco v. Wal–Mart,* 2002 WL 272384, at *4 (E.D.La. Feb. 25, 2002) (finding no evidence that defendant employer was explicitly or implicitly attempting to discourage or prevent the employees from participating in the lawsuit nor any evidence that threats were made).

However, when these factors are considered in light of the facts of this case and, in particular, the *effect* that the communications had, the Court is forced to conclude that the defendants' communications were coercive.

The parties have submitted evidence that defendants communicated with three plaintiffs regarding this litigation. In all three cases, the plaintiffs felt that they were placed in a situation where they were required to distance themselves from the litigation. In the two instances of face-to-face communication, the plaintiffs gave written statements that they now profess to have been untrue. Defendants argue that this was merely the result of "subjective" fears of the plaintiffs. But those subjective fears had very objective results that threaten both the relationship that plaintiffs had with their counsel and their participation in this litigation.

Thus, despite defendants' arguments to the contrary, plaintiffs have provided clear evidence that a potentially abusive situation exists sufficient to warrant a protective order. *See Kleiner,* 751 F.2d at 1206 ("[T]he absence of explicit proof or findings of harm or injury is immaterial and the trial court is empowered to enter prophylactic orders designed to prevent harm before it happens.") (quotes and cite omitted). Even if the defendants did not engage in any intentional coercion, the effect that these in-person communications had on the plaintiffs convinces the Court that they were inherently coercive. Should these types of communications continue, they would threaten the ability of plaintiffs and potential plaintiffs to assert their rights through this litigation.

Defendants also argue that the Court should not enter an order preventing communications with putative class members prior to class certification. The fact that the class has yet to be certified does not prevent the Court from issuing a protective order limiting communications with putative class members to protect the integrity of the litigation. *Jenifer v. Delaware Solid Waste Authority,* 1999 WL 117762 (D.Del. 2/25/99) (concluding that a court "does have the requisite authority to limit contacts with putative class members" prior to class certification); *Burrell v. Crown Cent. Petroleum, Inc.,* 176 F.R.D. 239, 243 (E.D.Tex.1997) (same).

■ Finally, defendants argue that the scope of the requested protective order is too broad and would unduly interfere with their free speech rights and their ability to defend this case. The Court agrees that the scope of the requested protective order is broader than necessary. The Court's primary concern is with in-person communications with putative class members that might be inherently coercive due to the parties' employment relationship and may pressure class members to make on the spot decisions that they would not otherwise make.

## IV. CONCLUSION

Experience has indicated that itinerant employees who sign onto class actions are open to influence from either the defendants or plaintiffs' counsel. When in the hands of a more sophisticated party they can be convinced to shout "Fire!" even in the absence of danger. Often their motives are pure—they simply aim to please whoever approaches them. But the reality is that these workers can get caught up in litigation and it becomes hard to tell where they really stand.

The Court does not take a position on what the truth actually is in this "he said, she said" dispute. Defendants and plaintiffs' counsel must take great care not to put pressure on these plaintiffs to advance their own agendas.

The Court will grant a limited protective order, but will ensure that defendants have the opportunity to fully investigate and defend this case.

The Court *ORDERS* that communications be limited in the following manner:

(1) Defendants, their employees, and agents, are hereby prohibited from further communications *by telephone or in person* with Plaintiffs, Opt-in Plaintiffs, Potential Opt-in Plaintiffs, and their family members regarding this lawsuit, their decision to participate as plaintiffs in this lawsuit, or their representation by Georgia Legal Services.

(2) Defendants shall retain the right to communicate with the aforemen-

tioned parties regarding this lawsuit *in writing* provided that they serve a copy of the correspondence on plaintiffs' counsel at least ten days in advance in order to resolve any potential objections.

(3) Nothing in this Order shall limit the defendants' communications made through formal discovery.

(4) This Order shall remain in place throughout this litigation. However, if the Court denies class certification, then this Order will expire at that time.

Plaintiffs' Motion for a Protective Order, doc. # 6, is ***GRANTED IN PART.*** Future communications by the defendants shall be limited pursuant to the terms of this Order.